ORIGINAL

Approved: _____
          ANDREW C. ADAMS/ANDREW M. STHOEASY.
          Assistant United States Attorney

Before:   THE HONORABLE DEBRA FREEMAN
          United States Magistrate Judge
          Southern District of New York          17 MAG 8866

                                                 DOC #____ ____

- - - - - - - - - - - - - - - - - - - x
                                      :
UNITED STATES OF AMERICA              :   **COMPLAINT**
                                      :
          - v. -                      :   Violation of
                                      :   18 U.S.C. § 1349
STEPHEN BAPTISTE,                     :
                                      :   COUNTY OF OFFENSE:
                    Defendant.        :   NEW YORK
                                      :
- - - - - - - - - - - - - - - - - - - x


SOUTHERN DISTRICT OF NEW YORK, ss.:

          AARON J. OTTERSON, being duly sworn, deposes and says
that he is a Special Agent with the Federal Bureau of
Investigation ("FBI"), and charges as follows:

                        **COUNT ONE**

          1.   From at least in or about September 2016, up to
and including in or about November 27, 2017, in the Southern
District of New York and elsewhere, STEPHEN BAPTISTE, the
defendant, and others known and unknown, knowingly and willfully
did combine, conspire, confederate and agree together and with
each other to commit an offense against the United States, to
wit, to violate Title 18, United States Code, Section 1341 and
1343.

          2.   It was also a part and an object of the
conspiracy that STEPHEN BAPTISTE, the defendant, and others
known and unknown, having devised and intending to devise a
scheme and artifice to defraud, and for obtaining money and
property by means of false and fraudulent pretenses,
representations, and promises, and attempting to do so, for the
purpose of executing such scheme and artifice, and attempting to
do so, would and did place in any post office and authorized
depository for mail matter, matters and things to be sent and

delivered by the Postal Service, and would and did deposit and cause to be deposited matters and things to be sent and delivered by private and commercial interstate carriers, and would and did take and receive therefrom such matters and things, and would and did knowingly cause to be delivered by mail and such carriers according to the direction thereon, and at the place at which it was directed to be delivered by the person to whom it was addressed, such matters and things, in violation of Title 18, United States Code, Section 1341, to wit, BAPTISTE fraudulently inflated the volume of recyclable containers delivered to a particular recycling facility, thereby causing victim-bottling companies to overpay reimbursements and service fees, some of which reimbursements and services fees were mailed to BAPTISTE's co-conspirators, while BAPTISTE received kickbacks for his role in facilitating that fraud.

3.    It was also a part and an object of the conspiracy that STEPHEN BAPTISTE, the defendant, and others known and unknown, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, and attempting to do so, would and did transmit and cause to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, in violation of Title 18, United States Code, Section 1343, to wit, BAPTISTE fraudulently inflated the volume of recyclable containers delivered to a particular recycling facility, thereby causing victim-bottling companies to overpay reimbursements and service fees, sent in the form of checks mailed to BAPTISTE's co-conspirators, who arranged the delivery of recyclable containers through, among other means, interstate telephone calls between New York and New Jersey, while BAPTISTE received kickbacks for his role in facilitating that fraud.

(Title 18, United States Code, Section 1349.)

4.    The bases for my knowledge and the foregoing charge are, in part, as follows:

5.    I am a Special Agent with FBI and have been personally involved in the investigation of this matter.  This Affidavit is based upon my personal participation in the investigation, my examination of reports and records, and my conversations with other law enforcement agents and other individuals.  Because this Affidavit is being submitted for the

2

limited purpose of demonstrating probable cause, it does not
include all the facts that I have learned during the course of
my investigation.  Where the contents of documents and the
actions, statements, and conversations of others are reported
herein, they are reported in substance and in part, except where
otherwise indicated.

### THE NEW YORK STATE RETURNABLE CONTAINER ACT

6.    From my review of publicly available information
provided by the New York State Department of Taxation and
Finance ("DTF") and the New York State Department of
Environmental Conservation ("DEC"), I have learned, among other
things, that:

a.  The State's Returnable Container Act (the
"RCA"), codified at New York Environmental Conservation Law,
Article 27, Title 10, was initially enacted in or about 1983 as
a legislative response to litter, environmental damage, and
related budgetary burdens associated with the production and
disposal of beverage containers, *i.e.*, bottles and cans.  Since
its initial enactment, the RCA has been amended at various
times, including in 2009 and 2013, and currently includes a
regulatory scheme designed to promote the recycling of bottles
and cans by bottlers, beverage distributors, and container
redemption centers.

b. Under the regulatory scheme established pursuant
to the RCA, certain companies referred to as "deposit
initiators" must collect a $.05 deposit on every container for
certain specified beverages, including soft drinks, beer, and
bottled water, sold in New York State.  Deposit initiators are
the first bottler, distributor, or dealer to collect the
required deposits on beverage containers.  Deposit initiators
must, among other things, register as a deposit initiator with
the State, establish a refund value account, track all deposits
collected, and file quarterly reports with DTF.

c.  "Refund value accounts" are bank accounts
established by deposit initiators for the purpose of holding the
deposits paid by consumers.  The accounts are used to reimburse
customers (or other companies, as described in more detail
below) that redeem bottles to the deposit initiator for the
purpose of recycling those bottles.  At the end of each fiscal
quarter, the deposit initiator must remit 80% of the balance of
such refund value accounts (i.e., the amount remaining in those
accounts after the reimbursement of deposits to redeeming

3

persons or entities) to the DTF; the remaining 20% of the quarterly balance may be withdrawn by the deposit initiator for its own use (subject to certain restrictions not relevant to this Complaint).

> d. In addition to the $.05 deposit that must be reimbursed to redeeming individuals or entities, deposit initiators must pay a handling fee of $.035 per empty beverage container redeemed by "redemption centers," which are defined as, *inter alia*, "any person offering to pay the refund value of an empty beverage container to a redeemer [*i.e.*, a person demanding the refund value in exchange for an empty beverage container]." 6 N.Y.C.R.R. § 367.2(r); *see also* 6 N.Y.C.R.R. § 367.6 ("A distributor must pay to each dealer or redemption center a handling fee of not less than 20 percent of the refund value of each empty beverage container accepted from such dealer or redemption center. This handling fee must be paid in addition to the refund value of each such empty beverage container.").

### INVESTIGATION OF BAPTISTE

> 7.   From my conversations with a confidential source working at the direction of the FBI ("CS-1"),[1] as well as my review of transcriptions of conversations between CS-1 and certain participants in the conspiracy charged herein, which were consensually recorded by CS-1 during in-person and telephonic conversations involving CS-1, I have learned, among other things, that:

---

[1] CS-1 initially approached law enforcement in or about 2016 regarding an attempt by another individual ("Individual-1") to extort CS-1 in connection with the repayment of debts from CS-1's gambling losses at an illegal gambling establishment. Subsequently, CS-1 cooperated with law enforcement by, among other things, obtaining consensually recorded conversations with Individual-1 and others, and by describing his knowledge of and prior participation in the offenses described herein. CS-1 is not receiving compensation for cooperation; rather, CS-1 is cooperating in the hope of receiving leniency with respect to his own criminal exposure. CS-1 has been corroborated by, among other things, information and recordings obtained through other confidential sources regarding the activities of Individual-1, as well as information and recordings obtained by CS-1 regarding the offenses described herein.

4

a.    Since in or about 2013, CS-1 has worked as a truck
driver for a company ("Company-1") managed by two relatives ("CC-
1" and "CC-2," respectively).  Company-1 is based in Brooklyn, New
York, and is a redemption center within the definition set forth
above.[2]  Company-1 collects recyclable beverage containers for
redemption to various deposit initiators, including two particular
bottling companies ("Depositor-1" and "Depositor-2"), whose
beverage containers are each returned to the same redemption
facility located in Queens, New York ("Facility-1").  Company-1
pays members of the public $.05 for each empty beverage container
returned to Company-1, and subsequently compiles and delivers
those empty containers to Depositor-1 and Depositor-2, among other
deposit initiators, in return for reimbursement of the $.05 refund
initially paid by Company-1 and a handling fee.  CS-1's role at
Company-1 has been to deliver empty bottles on behalf of Company-
1 to Depositor-1 and Depositor-2 at Facility-1.

b.    In order to defraud Depositor-1 and Depositor-2,
and ultimately the State, CC-1, CC-2, and STEPHEN BAPTISTE, the
defendant, who is an employee of Facility-1, falsely overstate the
number of empty beverage containers delivered by Company-1 to
Facility-1.  The false inflation of recycled containers results in
an overpayment of bottle deposits and handling fees to Company-1.[3]

---

[2] Furthermore, I have learned from a review of bank records
relating to various entities and "DBAs" controlled by CC-1,
among others, that CC-1 is listed as the President of a
particular company ("Company-2").  From my review of open source
information available on the internet, and from a report by law
enforcement officers regarding an on-site visit, I have learned,
among other things, that Company-2 is a Manhattan-based
container collection point, *i.e.*, a business that collects
containers before those containers are compiled at Company-1's
main warehouse with containers collected from around the New
York City area.  Bottles collected at Company-2, therefore, are
used in part in the commission of the conspiracy described
herein.

[3] From my review of bank records relating to various limited
liability corporations and other entities formed by CC-1,
including Company-1, I have learned, among other things, that
bank accounts controlled by CC-1 have received checks drawn on
bank accounts belonging to Depositor-1 and Depositor-2,
reflecting payments of service fees and reimbursements for
Company-1's delivery of recyclable containers to Facility-1.  As
set forth in more detail above, these checks, drawn on the
accounts of Depositor-1 and Depositor-2, represent moneys and

5

BAPTISTE, in turn, receives kickbacks in the form of cash payments from CC-1 and CC-2, delivered by CS-1.

        c.    CS-1, when picking up shipments of bottles from Company-1, has viewed invoices maintained principally by CC-2 that reflect the actual volume of empty containers being delivered to Facility-1. After driving those containers to Facility-1, the bottles are off-loaded by BAPTISTE, among others. BAPTISTE then provides a separate invoice to CS-1 reflecting a falsely inflated number of containers. CS-1 then returns to Company-1, provides the falsely inflated invoice to CC-2. CC-2 then pays CS-1 in cash, with the amount paid depending on the extent of inflation reflected on the fraudulent invoice provided by BAPTISTE. Typically, the degree of false inflation equates to approximately $1,000 per truckload in fraudulently inflated "redemptions" and handling fees to be paid to Company-1 by Depositor-1 and Depositor-2. Of that $1,000, CC-2 allocates approximately $700 to himself, CC-1, and BAPTISTE, while $300 is allocated to CS-1.

        d.    During the course of this investigation, CS-1 has obtained photographs of writings produced by employees and contractors hired by Company-1 reflecting the actual number of empty containers delivered to Depositor-1 and Depositor-2, as well as photographs of the inflated invoices prepared by BAPTISTE and used by CC-2 to calculate payments to CS-1, CC-1, CC-2, and BAPTISTE. For example:

        i.    On or about September 28, 2016, CS-1 photographed notes reflecting the actual number of empty containers delivered to Depositor-1 and Depositor-2 by CS-1 on that day, as well as the falsely inflated invoices provided by BAPTISTE for Depositor-1 and Depositor-2. For 12 oz cans, the invoice provided by BAPTISTE included a reported delivery that was inflated by approximately 11% of the actual number of cans delivered to Facility-1 on that day.[4]

---

funds under the custody or control of those depositor-victims' banks. From my review of bank records of Company-1, I have learned that these checks appear to have been sent from a bank branch in Maine to Company-1 in New York, through the mail.

[4] CC-1, CC-2, and BAPTISTE, among others, also engage in inflating the numbers of other empty containers, including 20 oz bottles, 1 liter bottles, and 2 liter bottles. In this Complaint, I report only the inflation of 12 oz cans on the particular days described.

     ii.  On or about October 3, 2016, CS-1 photographed notes reflecting the actual number of empty containers delivered to Depositor-1 and Depositor-2 by CS-1 on that day, as well as the falsely inflated invoices provided by BAPTISTE for Depositor-1 and Depositor-2. For 12 oz cans, the invoice provided by BAPTISTE included a reported delivery that was inflated by approximately 55% of the actual number of cans delivered to Facility-1 on that day.

     iii.  On or about October 5, 2016, CS-1 photographed notes reflecting the actual number of empty containers delivered to Depositor-1 and Depositor-2 by CS-1 on that day, as well as the falsely inflated invoices provided by BAPTISTE for Depositor-1 and Depositor-2. For 12 oz cans, the invoice provided by BAPTISTE included a reported delivery that was inflated by approximately 57% of the actual number of cans delivered to Facility-1 on that day.

    e. Since October 2016, CS-1 has continued to discuss the recycling fraud with CC-1, CC-2, BAPTISTE, and another driver working for CC-1 and CC-2 ("CC-3"), among others. For example: On or about April 17, 2017, CS-1 engaged in a recorded in-person conversation with CC-3 during which the following exchange ensued:[5]

| | |
|---|---|
| CS-1: | I just wanted to count. . . That's why… regarding our dealings. It turned out, in the fir— during the first week, there were 14 trucks? 360 each, right? No, 320 each. |
| . . . | |
| CS-1: | Uh-huh. It turns out the Black [*i.e.,* BAPTISTE] one took 14 x $200, [*i.e*] $2,800. |
| CC-3: | Uh-huh. |
| CS-1: | Minus what [CC-2] took, uh, 14 x $20, $280. So minus $280, $1,400 left. Divide by two, equals $700. |
| CC-3: | Uh-huh. |
| CS-1: | Okay? |

---

[5] All excerpts are from draft translations of transcribed recordings.

CC-3:       Did you take off $500?

CS-1:       Yes. [OV] 200 dollars more.

CC-3:       [OV] You still owe $50. You still owe me $50.

CS-1:       [OV] Yes. Yes. Now—

CC-3:       Twelve trucks.

CS-1:       Last week times $320—

CC-3:       Minus…

CS-1:       Minus uh… $1,800 to the Black one, right?

CC-3:       $1,800… minus…

CS-1:       $240 to [CC-2], right?

CC-3:       Uh-huh. Minus…

CS-1:       Divide by two. [Pause] Equals $900. Minus $500
            and minus $50. Minus $550… So it leaves $350.
            Right?

CC-3:       $350 what?

CS-1:       What's owed to me. Because $1,800 was left after
            the Black one and after [CC-2]. Right?

CC-3:       Minus… minus…

CS-1:       Twelve trucks $320 each equals $3,840 minus
            $1,800—

CC-3:       [OV] Minus $100, minus… $500, minus $500 [UI],
            $400 [UI]

CS-1:       Huh?

CC-3:       [UI] …see? Divide by two, minus $50 equals $350.

CS-1:       Right? Did he do everything today? Three trucks?

CC-3:       Two.

CS-1:       Ah, only two?

CC-3:       They are not taking three.

CS-1:       Oh, they didn't take the third one.

CC-3:       There's no [UI], a lot of [bottles produced by
            Depositor-1].

.  .  .

CC-3:       [UI] says, "Go, pay because… I don't want any
            problems with the Black one. Tomorrow [an
            unidentified individual] will come, tell him that
            we [UI]. I – okay, took $2,800 and gave it to
            them. Last time it was $1,800. And still he is
            telling me now, "You owe me for three more
            trucks." Six hundred dollars, like I owe $300 and
            you owe $300. Three-fifty is left.

CS-1:       Well, it's for each, it's my share. The $1,800
            that's left is the total.

CC-3:       Okay, but—

CS-1:       Right?

CC-3:       If I give $300 there, you'll have 50 dollars left
            there, right?

CS-1:       Yes.

CC-3:       That's why you have to clarify it with the Black
            one—

CS-1:       Where he got this.

CC-3:       Right.

CS-1:       Okay I'm gonna call now—

CC-3:       [OV] [UI]

CS-1:       And how is he today? I'm curious what he wants
            for today. I'm gonna ask [CC-2] now. What it is
            today. I'm gonna ask [CC-2].

Based on my experience in this investigation, my conversations with CS-1 following this exchange with CC-3, my review of prior recorded conversations, and my participation in subsequent surveilled and/or recorded meetings between CS-1 and participants in this scheme, I understand that, during this conversation, CS-1 and CC-3 discussed the distribution of proceeds from the recycling scam orchestrated by CC-1, CC-2, and BAPTISTE, who is referred to as "Black" or "the black one" by CC-3 and others in this scheme.  In particular, CC-3 and CS-1 discussed the amounts of money being withheld or paid to BAPTISTE and CC-2 ("Because $1,800 was left after the Black one and after [CC-2].").  CC-3, moreover, makes reference to the volume of deliveries subject to the fraudulent inflation and, consequently, part of the tabulation of proceeds owed to BAPTISTE and CC-2 ("CC-3:  Twelve trucks. / CS-1: Last week times $320– / CC-3: Minus… / CS-1: Minus uh… $1,800 to the Black one, right? / CC-3: $1,800… minus… / CS-1:   $240 to [CC-2], right? / CC-3: Uh-huh. Minus…").

> f.    Since October 2016, CS-1 has continued to assist in the investigation of this scheme.  For example, on or about September 8, 2017, CS-1 engaged in a surveilled and recorded conversation with BAPTISTE during which time CS-1 provided BAPTISTE with funds from CC-1 and CC-2 as a kickback for the recycling scheme that BAPTISTE facilitates at Facility-1.  During that conversation, the following exchange ensued:

CS-1:    Pay some bills, so I was going to ask you think we go back to before go back to thirty, thirty you think? So we can make a little extra.

SB:    Hmm.

CS-1:    Thirty, thirty, thirty cans thirty points.

SB:    Nah, I tell you, they watching already.  Can't really go that way you know.

. . .

SB:    You got to drop a little lower maybe like two you know.

CS-1:    Oh you mean drop it even more.

SB:    No you got to drop instead like you know like three you drop like two you know got to make it look like. . .

10

CS-1:      No but I think he knows I can always show him how stacked the warehouse is so we have stuff enough till next summer, because not right now because we bring in less than we have you know what I mean? Like I can bring four trucks worth of stuff every day maybe for at least a month that's already straight product that not counting the mix.

SB:        Asking for trailer and thing. . .

CS-1:      Yeah, Yeah they sent it to me once or twice.

SB:        I don't know when going to see how it goes.

CS-1:      I think we okay because…

SB:        No I said we going to see how it going to work out. [UI] that why sometimes ah, ah, ah I put like some bad cans and stuff for you. Because when you perfect like that.

CS-1:      The weight.

SB:        The weight can't be perfect all the time.

Based on my experience in this investigation, my conversations with CS-1 following this exchange with BAPTISTE, my review of prior recorded conversations between and among CS-1, CC-1, CC-2, and BAPTISTE, I understand that, during this conversation, CS-1 proposed to BAPTISTE that BAPTISTE increase the degree of fraudulent inflation of recycled containers, but that BAPTISTE was hesitant to further increase the inflation for fear of discovery by others ("CS-1: . . . so I was going to ask you think we go back to before go back to thirty, thirty you think? So we can make a little extra. / SB:    Hmm. / CS-1:    Thirty, thirty, thirty cans thirty points. / SB:    Nah, I tell you, they watching already.  Can't really go that way you know."). BAPTISTE also described one means by which he falsely alters the accounting and inventorying of containers delivered by CS-1 so as to avoid scrutiny of BAPTISTE's reports regarding the falsely inflated volume of such containers ("SB: . . . that why sometimes ah, ah, ah I put like some bad cans and stuff for you. Because when you perfect like that. / CS-1:  The weight. / SB:  The weight can't be perfect all the time.").

8.     From my conversations with CS-1, I have learned, among other things, that a particular truck driver ("Driver-1") is a New Jersey-based driver for Company-1 who collects recyclable containers from collection points in Manhattan before delivering those containers to Company-1, before Company-1 then uses those containers in furtherance of the recycling scheme described above.  From my review of toll information for a telephone belonging to CC-1, I have learned, among other things, that CC-1 is in telephone contact with Driver-1 via calls placed to a cellular telephone identified by service provider subscriber information as belonging to Driver-1.  As described by CS-1, Driver-1 delivers bottles to Company-1 before CS-1 and others deliver those bottles to Depositor-1 and Depositor-2, among other initial depositors, thereby providing the materials necessary to successfully perpetrate the fraud.[6]

WHEREFORE, deponent requests that a warrant be issued for the arrest of STEPHEN BAPTISTE, the defendant, and that he be arrested and imprisoned, or bailed, as the case may be.

AARON J. OTTERSON
Special Agent, FBI

Sworn to before me this
30th day of November, 2017

HONORABLE DEBRA FREEMAN
Chief United States Magistrate Judge
Southern District of New York

---

[6] CS-1 does not know Driver-1 to be knowingly involved in the recycling fraud described herein.  However, Driver-1 is included as a demonstration of probable cause to believe that the charged conspiracy includes the use of interstate telephone calls in furtherance of the charged conspiracy, namely the coordination of deliveries by CC-1 and Driver-1 for use by CC-1 in furtherance of the fraud.

12